UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CLINT H.[1], | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:21-cv-03020-RLY-MJD |
| | ) |
| KILOLO KIJAKAZI, | ) |
| | ) |
| Defendant. | ) |

**REPORT AND RECOMMENDATION**

Claimant Clint H. requests judicial review of the denial by the Commissioner of the Social Security Administration ("Commissioner") of his application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. On March 7, 2022, United States District Judge Richard L. Young entered an Order referring this matter to the Undersigned for a report and recommendation regarding the appropriate disposition pursuant to 28 U.S.C. § 636(b)(1)(B). [Dkt. 14.] For the reasons set forth below, the Undersigned recommends that the ALJ's decision denying Claimant benefits be **REVERSED** and **REMANDED** for further proceedings.

---

[1] In an attempt to protect the privacy interest of claimants for Social Security benefits, consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States Courts, the Southern District of Indiana has opted to use only the first name and last initial of non-governmental parties in its Social Security judicial review opinions.

## I. Procedural History

On December 11, 2018, Claimant filed his application for Title II DIB. [Dkt. 7-2 at 11.] Claimant's application alleged disability resulting from status post multiple foot surgeries with adverse residuals, status post right shoulder surgery with adverse residuals, multiple spine disorders, chronic pain, loss of range of motion in the right shoulder, and limited mobility requiring assistive devices. [Dkt. 7-10 at 5.] The Social Security Administration ("SSA") denied Claimant's claim initially on March 27, 2019, [Dkt. 7-5 at 7], and on reconsideration on June 13, 2019, *id.* at 17.

Claimant requested a hearing, which was held on April 22, 2021, before Administrative Law Judge ("ALJ") Marc Jones. Claimant, his counsel, and vocational expert Thomas Upton all appeared telephonically. [Dkt. 7-2 at 11.] On May 4, 2021, ALJ Jones issued an unfavorable decision finding that Claimant was not disabled. *Id.* On October 8, 2021, the Appeals Council denied Claimant's request for review, making the ALJ's decision final. *Id.* at 2. Claimant now seeks judicial review of the ALJ's decision denying benefits. *See* 42 U.S.C. § 405(g).

## II. Legal Standards

To be eligible for benefits, a claimant must have a disability pursuant to 42 U.S.C. § 423. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, the Commissioner, as represented by the ALJ, employs a sequential, five-step analysis: (1) if the claimant is engaged in substantial gainful activity, he is not disabled; (2) if the claimant does not have a "severe" impairment, one that significantly limits his ability to perform basic work

activities, he is not disabled; (3) if the claimant's impairment or combination of impairments meets or medically equals any impairment appearing in the Listing of Impairments, 20 C.F.R. pt. 404, subpart P, App. 1, the claimant is disabled; (4) if the claimant is not found to be disabled at step three, and is able to perform his past relevant work, he is not disabled; and (5) if the claimant is not found to be disabled at step three, cannot perform his past relevant work, but can perform certain other available work, he is not disabled. 20 C.F.R. § 404.1520. Before continuing to step four, the ALJ must assess the claimant's residual functional capacity ("RFC") by "incorporat[ing] all of the claimant's limitations supported by the medical record." Crump v. Saul, 932 F.3d 567, 570 (7th Cir. 2019).

In reviewing Claimant's appeal, the Court will reverse only "if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence." Martin v. Saul, 950 F.3d 369, 373 (7th Cir. 2020). Thus, an ALJ's decision "will be upheld if supported by substantial evidence," which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Jozefyk v. Berryhill, 923 F.3d 492, 496 (7th Cir. 2019).

An ALJ need not address every piece of evidence but must provide a "logical bridge" between the evidence and his conclusions. Varga v. Colvin, 794 F.3d 809, 813 (7th Cir. 2015). This Court may not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the ALJ. Burmester v. Berryhill, 920 F.3d 507, 510 (7th Cir. 2019). Where substantial evidence supports the ALJ's disability determination, the Court must affirm the decision even if "reasonable minds could differ" on whether Claimant is disabled. Id.

### III. ALJ Decision

The ALJ first determined that Claimant had not engaged in substantial gainful activity since his alleged onset date of September 13, 2018. [Dkt. 7-2 at 13.] At step two, the ALJ found

3

severe impairments of major joint dysfunction of the right shoulder, obesity, right foot osteoarthritis, and ankle joint fusion. [*Id.*] The ALJ also determined that Claimant had non-severe impairments of carpal tunnel syndrome, right thumb disorder, anxiety, and depression. [*Id.* at 14.] At step three, the ALJ found that Claimant's impairments did not meet or medically equal the severity of one of the listed impairments during the relevant time period. [*Id.* at 15.] The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform sedentary work, with the following limitations:

> occasionally reach overhead with the dominant right arm; frequently reach in all other directions with the dominant right arm; occasionally operate foot controls with the right foot; occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; never climb ladders, ropes, scaffolds, or work at unprotected heights; and never balance, as that term is defined in the Selected Characteristics of Occupations.

[*Id.* at 16.]

At step four, the ALJ concluded that Claimant was unable to perform any of his past relevant work. *Id.* at 20. At step five, relying on the vocational expert's testimony, the ALJ determined that, considering Claimant's age, education, work experience, and residual functional capacity, other jobs existed in significant numbers in the national economy that Claimant could perform. *Id.* at 20. The ALJ thus concluded that Claimant was not disabled. *Id.* at 21.

## IV. Discussion

In support of his request for reversal, Claimant challenges the ALJ's decision on two grounds, each of which is discussed, in turn, below.

### A. RFC Determination

Claimant asserts that the ALJ erred in determining his RFC because the ALJ impermissibly interpreted numerous medical records not reviewed by the state agency physicians

4

in finding that Claimant could occasionally reach overhead with his dominant right arm and frequently reach in all other directions with that arm.[2] This determination was critical to the ALJ's ultimate decision, as the VE testimony indicates that if Claimant could only reach occasionally, rather than frequently, in all other directions, there would be no jobs Claimant could perform. [Dkt. 7-3 at 38.]

The Seventh Circuit has defined the RFC as "the claimant's ability to do physical and mental work activities on a regular and continuing basis despite limitations from h[is] impairments." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). It is the most the claimant can do despite his limitations. 20 C.F.R. § 404.1545(a)(1). When determining the RFC, the applicable regulations and Seventh Circuit case law make clear that an ALJ's RFC assessment must incorporate all of a claimant's functional limitations supported by the medical record. *See Varga*, 794 F.3d at 813; *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010) ("When determining a claimant's RFC, the ALJ must consider the combination of all limitations on the ability to work, including those that do not individually rise to the level of a severe impairment."); *Crump*, 932 F.3d at 570; *see also* SSR 96-8p; 20 C.F.R. § 404.1545(a).

Claimant argues that it was error for the ALJ to make his findings regarding Claimant's ability to reach with his right arm without the benefit of expert medical opinion on the subject

---

[2] Claimant actually argues that "[t]he ALJ's residual functional capacity is fatally undermined by the fact he relied on his own impermissible interpretations of complex medical testing instead of soliciting an opinion regarding the reaching limitations implicated by [Claimant's] right shoulder etiology and related clinical observations," [Dkt. 13 at 19], and that "a reasonable medical expert might have opined the previously-not-scrutinized etiology and clinical findings suggested he was more limited in his ability to reach than the ALJ concluded on his own," *id.* at 21. This is a misuse of the word "etiology," which means "the cause of a disease or abnormal condition." Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/etiology.

that was based on the entirety of Claimant's medical records.  Claimant points to several relevant medical records that apparently were not reviewed by the state agency medical consultants, because, while they pre-date the consultants' review, they were submitted to the record subsequent to that review.[3]  Claimant argues:

> While the agency's reviewing physicians were vaguely aware of "shoulder pain," vaguely-described "surgery," and the consultative examiner's observation of "marked difficulty lifting right arm," they do not appear to have reviewed any records which detail [Claimant's] right shoulder etiology or the clinical examination findings.  [Dkt. 7-4 at 10, 16, 21, 27.]  They never saw records which indicated Claimant under went right shoulder surgery arthroscopic rotator cuff repair, arthroscopic acromioplasty, and arthroscopic debridement of glenoid labrum tear for the right shoulder in 2016 following his initial rotator cuff tear and surgical repair in 2015.  [Dkt. 7-15, 4; Dkt. 7-26, 55.]  Nor did the right shoulder imaging or observations of reduced right shoulder strength, positive empty can test, and positive impingement test which resulted in Dr. Frank Johnson's diagnosis of a new "partial tear" and a second surgery.  [Dkt. 7-26 at 57-60.]  Likewise, they did not see Dr. Johnson's observations of the physical therapy records which followed that second major surgery and indicated [Claimant] continued to exhibit "limited" range of motion and strength of his right shoulder.  *Id.* at 53 [].  By October of 2016, two months after his second surgery, [Claimant] continued to exhibit "limited ROM and strength" in the right shoulder.  *Id.* at 48 [].  While he was discharged from therapy eight days after this and "released to return to work with no restrictions," Social Security's own consultative examiner observed, three years later, that [Claimant] continued to have "marked difficulty lifting right arm"; diminished motor strength; and reduced right shoulder abduction and external rotation.  [Dkt. 7-24 at 26, 28; Dkt. 7-26 at 46.]

[Dkt. 13 at 22-23.]

It is true that, as Claimant argues, an ALJ may not "rel[y] on his own impermissible interpretations of complex medical testing." [Dkt. 13 at 19] (citing *Goins v. Colvin*, 764 F.3d 677 (7th Cir. 2014); *McHenry v. Berryhill*, 911 F.3d 866 (7th Cir. 2018); and *Akin v. Berryhill*, 887

---

[3] The state consultants last reviewed [Claimant's] medical records in June 2019.  [Dkt. 7-4 at 29.]  The cover sheets for the relevant records state that they were "submitted" on February 6, 2020, May 29, 2020, and April 21, 2021, after the state consultants' review.

6

F.3d 314 (7th Cir. 2018)). However, the records pointed to by Claimant in this case do not require medical interpretation; on their face, they demonstrate that Claimant had surgeries on his shoulder and, in the end, ten weeks after his second shoulder surgery, his surgeon noted the following:

> [Claimant] is having no pain requiring no medication. The patient's strength in operative shoulder is adequate. Shoulder range of motion in forward flexion in 150 degrees. Abduction is 90 degrees. External rotation is 50 degrees. Internal rotation behind the back is to L5/S1. The patient has no neurological deficit in the operative extremity. The incision appears well healed. The patient has reached full recovery.

[Dkt. 7-26 at 46.] There was, therefore, medical evidence regarding the import of the records in question in the record, from Claimant's own treating physician. Further, the state agency consultants had the report from consultative examiner Dr. Bangura, who noted the following:

> Patient tore his bicep and his labia muscle area in 2015, he also had surgery in his right shoulder in 2015 for the issue. He states that he had bone spurs in his shoulder and he states that the bone spur shredded his rotator cuff so he had to have another surgery in 2016 to fix his rotator. Patient also had the bone spurs shaved off at that time. Patient states that they did physical therapy for both areas for 2 months and was released to go to work.

[Dkt. 7-24 at 24.] Dr. Bangura also documented Claimant's range of motion at the time of her exam and noted that he "had pain on the right shoulder and had marked difficulty lifting right arm." *Id.* at 26, 28. Claimant does not explain what the additional medical records could have added to the state consultants' evaluation of Claimant's shoulder issue.

Given the information the state agency consultants had and the medical records from Claimant's surgeon that were available to the ALJ, the ALJ did not err in failing to obtain new opinions from the state agency consultants to consider the additional records. *Cf. Durham v. Kijakazi*, 53 F.4th 1089 (7th Cir. 2022) (While "[s]ome of Ms. Durham's tests certainly were complex . . . the ALJ did not attempt to interpret, on his own, the significance of any of these

medical tests or procedures. Rather, he relied, as he should, on the conclusions of her treating physicians."). Accordingly, the undersigned does not recommend remand on this issue.

### B. Step Five Determination

Claimant argues that the ALJ's step five conclusion concerning the number of available jobs in the national economy that Claimant can perform is flawed because it is not supported by substantial evidence or the relevant legal standards. [Dkt. 13 at 24.] At step five of the sequential process for determining disability, the Commissioner bears the burden of establishing that the claimant can, considering his RFC, age, education, and work experience, perform other work that exists in significant numbers in the national economy. 20 C.F.R. § 404.1560(c)(2); *see Britton v. Astrue*, 521 F.3d 799, 803 (7th Cir. 2008). For this fifth and final step in the analysis, "ALJs often rely heavily on two sources of occupational information to determine whether the government has met its burden: the [Dictionary of Occupational Titles ("DOT")] and Vocational Experts." *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

> The DOT, published by the Department of Labor, provides standardized occupational information, including the most typical characteristics of jobs as they exist throughout the American economy. It classifies jobs based on a number of factors, such as worker actions, exertional level and skill requirements in order to facilitate the placement of applicants in positions that match their qualifications. The DOT has played a prominent role in social security hearings and ALJs are required to take administrative notice of the DOT under Social Security regulations. 20 C.F.R. § 404.1566(d)(1); 20 C.F.R. § 416.966(d)(1).

*Id.* Vocational experts

> are professionals under contract with SSA to provide impartial testimony in agency proceedings. [SSA, Hearings, Appeals, and Litigation Law Manual] I-2-1-31.B.1 (June 16, 2016); *id.*, at I-2-5-48. They must have "expertise" and "current knowledge" of "[w]orking conditions and physical demands of various" jobs; "[k]nowledge of the existence and numbers of [those jobs] in the national economy"; and "[i]nvolvement in or knowledge of placing adult workers[ ] with disabilities[ ] into jobs." *Id.* at I-2-1-31.B.1. Many vocational experts simultaneously work in the private sector locating employment for persons with

> disabilities. *See* C. Kubitschek & J. Dubin, Social Security Disability Law & Procedure in Federal Court § 3:89 (2019). When offering testimony, the experts may invoke not only publicly available sources but also "information obtained directly from employers" and data otherwise developed from their own "experience in job placement or career counseling." Social Security Ruling, SSR 00–4p, 65 Fed. Reg. 75760 (2000).

*Biestek v. Berryhill*, 203 L. Ed. 2d 504 (Apr. 1, 2019). The Seventh Circuit has recognized that the DOT is outdated, having last been revised in 1991, and that

> [b]eyond being outdated, the DOT's other significant limitation is that it describes only job duties and requirements, without also reporting an estimate of how many of those positions exist in the national economy. To determine the number of jobs, a VE must consult another resource. One commonly used is the Department of Labor's compilation of Occupational Employment Statistics. That publication does not use the DOT job grouping system, but instead relies upon another classification system, the Standard Occupational Classification (SOC).
>
> The use of one system to supply the job titles and another to provide the number of jobs creates a matching problem: a one-to-one correlation does not exist. When a VE identifies an SOC code and the number of jobs in that code, that number approximates (at best) the number of positions within a DOT job group—not the specific DOT job title that the VE identified as suitable for a particular claimant. Vocational counselors have recognized that this crude data matching is highly inaccurate and thus are advised not to perform this analysis in other areas of their practice (when they are not testifying in a disability hearing). See Mary Barros-Bailey and Sylvia Karman, *Occupational and Labor Market Information*, in FOUNDATIONS OF FORENSIC VOCATIONAL REHABILITATION 203, 221–25, 232–33 (Rick H. Robinson ed., 2014).

*Chavez v. Berryhill*, 895 F.3d 962, 965–66 (7th Cir. 2018).

In this case, the ALJ determined at step four that Claimant could not perform any of his past relevant work as a machine maintenance repairer or hand packager. [Dkt. 7-2 at 20.] The burden was then on the Social Security Administration to show whether there were nonetheless a significant number of other jobs in the national economy that Claimant could perform. *See*, 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f).

The evidence relevant to this issue consisted of the testimony of vocational expert Thomas Upton.  VE Upton identified three jobs listed in the DOT that the hypothetical individual described by the ALJ could perform:  callout operator, document preparer, and information clerk.  The VE testified that all three of these jobs were listed in the DOT as unskilled, with an SVP of 2.  He further testified that there were 91,000 document preparer jobs and 89,000 information clerk jobs in the national economy.[4]  [Dkt. 7-3 at 38.]   When asked by the ALJ whether his testimony was consistent with the DOT, the transcript indicates that VE Upton replied:  "It's consistent, but I do with all my years of experiences working since '93 with people with disabilities, many employers, many individuals."[5]  *Id.* at 40.

The vocational expert was then questioned by Claimant's counsel and the following exchange took place:

> Q:   Mr. Upton, you gave some job numbers for the—for various jobs that you identified.  What's the ultimate source of those job numbers?
>
> A:   Well, they're from an agency actually US Publishing, that's for the Department of Labor throughout the country.
>
> Q:   And when it publishes those numbers, those numbers aren't for the DOT codes, but those are actually for OES codes tied to O*NET descriptions, is that right?
>
> A:   Or the SOC, *Standard Occupational Classifications*.  The DOT is—yeah, again, exactly.  It's groupings, it's not specific jobs.  So—
>
> \*\*\*

---

[4] While the ALJ states in his decision that the vocational expert testified to 15,000 callout operator jobs in the national economy, [Dkt. 7-2 at 21], the Court is unable to find any such testimony in the hearing transcript.

[5] It is unclear whether the incomprehensibility of this and other responses is due to transcription errors.

> Q: And there is some way to crosswalk DOT codes to these grouping so that someone should take a DOT code and get an analyst, O*NET job description for the grouping. Is that right?
>
> ***
>
> A: Yes, yes.
>
> Q: Okay. And if we do that, the O*NET job descriptions that would correspond with the DOT codes, those would show an SVP range of like 4 to 6, is that right?
>
> A: I don't know. You need to tell me. I haven't analyzed it that way. But there may be some difference, of course. The data I'm using . . . is data I got from US Publishing, but it's separated out by DOT-P [phonetic] codes, 1 and 2 you know, break them out that way.
>
> Q: But it's possible that if we looked at the O*NET job descriptions for the O*NET classifications which are analogous to the DOT codes you gave it would show SVP ranges of 4 to 6.
>
> A: Yeah, I think so, sure.

[Dkt. 7-3 at 41-42.] The ALJ did not ask the VE any follow-up questions.

The Commissioner characterizes Claimant's position as arguing that the ALJ "impermissibly relied on vocational expert evidence that was based on the Dictionary of Occupational Titles rather than on another occupational database" in contravention of Claimant's "preference for the job descriptions in another occupational database." [Dkt. 16 at 1.] That misses the point of Claimant's argument, which is that it is impossible to tell from the record whether the numbers of jobs cited by the VE are skilled or unskilled. *See* [Dkt. 19 at 6] ("Here, the vocational expert effectively admitted the jobs numbers he gave did not pertain to the unskilled jobs as described in the dictionary of occupational titles."). If they are skilled, there is no evidence that Claimant could perform them. One can accept the DOT's classification of the jobs in question as unskilled, but one must then have a basis to determine that those unskilled

11

jobs exist in significant numbers in the national economy. If, in fact, the VE's source for job numbers was providing numbers for **skilled** versions of those types of job, there is no basis in the record for that determination.

> The method used by a VE to estimate job numbers
>
> "must be supported with evidence sufficient to provide some modicum of confidence in its reliability." [*Chavez*, 895 F.3d] at 969. And where, as here, the claimant challenges the job-number estimate, the ALJ "must require the VE to offer a reasoned and principled explanation" of the method he used to produce it. *Id.* at 970. And the explanation must be sufficient to instill some confidence that the estimate was not "conjured out of whole cloth." *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002).

*Brace v. Saul*, 970 F.3d 818, 822 (7th Cir. 2020). In this case, the Court has no such confidence in the VE's numbers based on the hearing transcript. It is impossible for the Court to determine whether this is simply a matter of unclear or incomplete testimony or whether the VE's job numbers actually have no evidentiary basis, given the possible difference between the DOT and the source of those numbers. It is therefore also impossible to determine whether the Commissioner has satisfied her burden at step five. Accordingly, the Undersigned recommends that this case be **REMANDED** in order to clarify and, if necessary, supplement the VE's testimony on this issue.

### IV. Conclusion

For the reasons detailed herein, the Undersigned recommends that this Court **REVERSE** the ALJ's decision denying Claimant benefits and **REMAND** for further proceedings consistent with this opinion.

Any objections to the Magistrate Judge's Report and Recommendation must be filed in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). Failure to file objections within

fourteen days after service will constitute a waiver of subsequent review absent a showing of good cause for such failure.

    SO ORDERED.

Dated: 27 DEC 2022

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email